FELIX MEJÍAS SANTANA, Petitioner, v. SUPERIOR COURT, SAN JUAN PART, J. M. ALMODÓVAR ACEVEDO, JUDGE, Respondent; DOLORES G. NADAL ET AL., Interveners.

No. 2362.    Resubmitted February 6, 1961.—Decided May 3, 1961.

*Juan T. Peñagaricano, Víctor M. Marchán, Abraham Freyre,* and *Nieves Agostini de Torres* for petitioner. *Rodríguez Emma & Rodríguez Ramón* for interveners.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

At the request of the Economic Stabilization Administrator we issued a writ of certiorari to review the judgment rendered by the Superior Court of San Juan, setting aside several final orders of said official issued on July 11, 1956, fixing the maximum rents for various commercial premises located on No. 4 Post Street, in Mayagüez.

██ In order to decide this appeal we find it necessary to make a survey of the legislation enacted in relation to the power of the Administrator to fix lease rentals since the enactment of Act No. 464 of April 25, 1946, Sess. Laws, p. 1326), 17 L.P.R.A. § 181 *et seq.*). The legislative authority was granted by virtue of § 6 of said Act (17 L.P.R.A. § 186), which has been amended by Acts No. 1 of July 16, 1946 (Spec. Sess. Laws, p. 2), No. 37 of July 22, 1947 (Spec. Sess. Laws, p. 140), No. 201 of May 14, 1948 (Sess. Laws, p. 574), and Act No. 88 of June 21, 1955 (Sess. Laws, p. 368).[1] It is also necessary that we state from the beginning the three different types of rents referred to in the Act: (1) *basic* rent, which is the rent that was paid on October 1, 1942, for premises intended for dwelling as well as for those intended for commercial purposes;[2] (2) *reasonable* rent, which is the

---

[2] For the purposes of this opinion, and except as otherwise indicated, "purposes," "rents" or "*commercial* premises," refer also to industry or business.

rent fixed by or which the Administrator has power to fix in certain specific cases, which we shall discuss hereinafter; and (3) *comparison* rent, which is the rent that under certain special circumstances the Administrator may fix on the basis of the rents prevailing in Puerto Rico for similar premises or dwellings on October 1, 1942.

*Properties which were rented on October 1, 1942*

The *basic rent* for these properties is the rent paid on October 1, 1942.[3]

The law authorizes the Administrator to fix *reasonable rents* in the following cases:

(*a*) When it is so justified by reason of (1) improvements of capital importance;[4] (2) increase or reduction of furniture, equipment or accessories; (3) increase or reduction in services or supplies; (4) deterioration of the dwellings or buildings leased, and (5) an increase in land taxes.

From May 14, 1948, date on which Act No. 201 of that year went into effect, no increase authorized by virtue of these provisions shall exceed by more than fifteen (15) per cent the basic rent. However, this limitation is not applicable in cases of buildings located within an old or historic zone, and which have been the object of substantial repair for the purpose of preserving the characteristics of the Spanish colonial period (Act No. 88 of 1955).

(*b*) When because of relationship or other personal or special relations between the landlord and the tenant or due to peculiar circumstances[5] the rent earned on October 1, 1942, was substantially lower than the rent earned for similar buildings;

---

[3] Whenever an agreement has been made prior to that date, fixing a higher or lower rent for any period subsequent to October 1, 1942, the basic rent shall be the rent agreed upon.

[4] Pursuant to § 5(*a*)(1) of the Rules for Commercial Premises, effective on November 1, 1946, capital improvement shall be understood as meaning "that improvement resulting from an additional structure, a structural improvement or a complete rehabilitation." See, also § 11(*e*) from the Rent Regulations (17 R. & R.P.R. § 186–11(e)), which was in effect since January 12, 1959.

[5] The Rules for Commercial Premises which took effect on November 1, 1946, considered "the substantial increase in the number of subtenants" as one of the special circumstances justifying an increase in the basic rent.

(c) When the property is furnished after October 1, 1942, the Administrator may authorize an increase in the basic rent. Until July 22, 1947, date on which Act No. 37 of that year went into effect, this increase could not exceed the twenty (20) per cent of the amount of the rent.

(d) When the tenant has an option for purchase prior to October 1, 1942, and it has been stipulated that the payments shall be credited to the purchase price. But if the tenant does not subsequently make use of said option, and the rent is higher than those prevailing on said date, the Administrator may, upon request of the tenant, fix the maximum rent on the basis of the rents prevailing on October 1, 1942.[6]

(e) Until the effectiveness of Act No. 201 of 1948, the Administrator could increase the rent of buildings intended for commercial purposes according to the commercial importance of the towns and districts where such buildings are located, and to the construction cost thereof, but in no case such increase cuold exceed fifty (53 per cent of the rental prevailing on October 1, 1942.[6a]

(f) Until Act No. 201 of 1948 went into effect, when in the judgment of the Administrator the rent prevailing on October 1, 1942, is excessive, unreasonable, or oppressive.

*Properties which were not leased on October 1, 1942*

There is no basic rent in these cases, and the Administrator has power to fix a *comparison* rent, that is, on the basis of the rents prevailing in Puerto Rico for similar premises or dwellings on October 1, 1942. This same rule was applied to the cases of buildings constructed after said date until the enactment of Act No. 201 of 1948, which authorized the fixing of rentals in the case of *new constructions* no lon-

---

[6] Section 5(c)(6) of the Rules for Commercial Premises.

[6a] Act No. 201 of 1948 provided that should an adjustment of the rent of any commercial premises have been made, increasing the basic rent by more than fifteen (15) per cent, and should the tenant claim or prove that such increase is not justified because of a drop in the volume of his business, or of losses or insecurity as a result of the post-war situation or of any other factor which may contribute to lessen substantially the revenues from his business, the Administrator could fix a new rent which in no case should exceed the basic rent or comparison rent by more than fifteen (15) per cent.

ger on the basis of the rents prevailing on October 1, 1942, but on the basis of the cost of construction of said dwelling or building, with the limitation that in no case should such rent exceed twelve (12) per cent of the total cost as computed for one year.[7]

*Lots on which Buildings belonging to Different Owners are Located*

Until the enactment of Act No. 37 of 1947, the determination of the reasonable rent of the lot which is the site of the buildings belonging to different owners, could not exceed twelve (12) per cent of the assessed value thereof. After the above-mentioned Act went into effect it is subject to "the norms established by this Act for dwellings or buildings devoted to commercial . . .purposes, as the case may be."[8]

██ The administrative record shows that on November 14, 1946, a registration statement covering the premises

---

[7] By express provision of § 24 of the Reasonable Rents Act of 1946 (17 L.P.R.A. § 214), as amended by Acts No. 61 of April 30, 1948 (Sess. Laws, p. 122) and No. 7 of August 19, 1948 (Spec. Sess. Laws, p. 204) the buildings for commercial purposes, the construction of which may be actually begun in the course of the year 1946 and completed within a period of one year counting from the date on which the construction of said property was actually begun, and the rental properties intended for dwellings which are constructed within the term referred to, and after the date on which the federal control over rents ceased (July 31, 1953), were declared exempt from the provisions of this Act as regards the amount of the rental to be charged. *Blanes* v. *District Court,* 71 P.R.R. 303 (1950); *Ledesma, Administrator* v. *District Court,* 71 P.R.R. 81 (1950); *Aponte* v. *District Court,* 68 P.R.R. 777 (1948). Act No. 201 of 1948, *supra,* provided specifically that no capital improvement, nor the reconstruction of the building, nor the conversion of a dwelling into commercial premises, nor the conversion of commercial premises into a dwelling shall be considered a "new building" to be exempt. By the provisions of Act No. 3 of March 10, 1958 (Sess. Laws, p. 3, 17 L.P.R.A. § 214(a)) those ancient buildings ·located within any historical zone which have been the object of improvements, reconstructions, or restoration, were likewise declared exempt from the provisions of this Act.

[8] This Act does not govern lease contracts of vacant lots where no building or premises are located, even though the lots are in the urban zone and are used for commercial or industrial purposes. *Riera* v. *Superior Court; Adm'r Econ. Stab., Int.,* 79 P.R.R. 598 (1956). *Cf. Igartúa* v. *Ruiz,* 73 P.R.R. 339 (1952).

involved in the case at bar was filed and it was set forth therein that the rent on October 1, 1942 as well as on July 17, 1946[8a] was $116.67 per month. Therefore, it is clear that these premises had a *basic* rent of $116.67, which could only be readjusted by virtue of any of the circumstances enumerated above when discussing the power of the Administrator to fix *reasonable* rents to properties which were rented on October 1, 1942. By virtue of the registration statement offered, the Administrator determined that the maximum rent of the premises was $116.67. The premises consisted of an extensive lot and an old brick building, which the tenant, Arbona Hnos., Inc., used as a biscuit factory. This tenant occupied the property from 1937 until 1952, and during this entire period, the owner did not obtain or take any steps for obtaining an increase in the basic rent. Said tenant made improvements amounting to $19,520.25 during the term of the lease (hearing of May 18, 1955, p. 31), and in the premises which he occupies at present under the name of Sucrs. de Blanes, Inc., he has made an additional investment of $8,000. (Id. p. 46).

When the property was vacated, the owner subdivided it in 1953 into five establishments and rented four of them at a total rent of $950 per month.[9] The *tenants reconstructed* said premises utilizing the old structure, and as it is alleged, one of them spent approximately $6,000. (Id. p. 59.) On June 23, 1954, tenant Ruiz made a complaint that the rent charged was excessive, and in his petition for a reduction he referred to the basic rent which Arbona Hnos. Inc. had paid. On October 6, 1954, the owner filed a registration statement of the premises occupied by Ruiz, and besides

---

[8a] The former Executive Council provided that Act No. 464 of 1946 with regard to commercial premises should take effect on July 17, 1946. (Section 27 of Act No. 464 of April 25, 1946.)

[9] The tenants were David Ruiz ($225.00), Delia Asencio ($225.00), Caribbean Electric Corp. ($300.00) and Sucrs. de Blanes ($200.00). There was a vacant establishment.

stating the area thereof, he informed that the *construction* was made prior to October 1, 1942. On the registration statement covering the premises occupied by the Caribbean Electric, Inc. it was reported that "this is a lot . . . whereon said corporation has set up a commercial establishment . . . ." On the following December 10, the owner offered a *registration statement of lots,* in which he set forth among other things, that "the premises were used for commercial purposes, they belong to the owner of the lot, but were repaired by the lessee, according to an agreement," and that "formerly it was a yard and formed part of a large rural property."

From the foregoing, it is inferred that not only did this establishment have a basic rent of $116.67 per month, but also that it was not a *new construction,* and that if a substantial part thereof had been reconstructed, the work had been done by the tenants and not by the owner. Notwithstanding this situation of facts, the Administrator, in order to decide the petition for reduction of the rent filed by tenant Ruiz, preferred to consider the case as one involving a new construction made after October 1, 1942, and he instructed that the rent be fixed on the basis of twelve (12) per cent annually of the cost of construction and of the value of the lot.[10] A hearing was held, and it was agreed therein that the old structure had a depreciated value of $19,000.[11] The con-

---

[10] The Administrator explains his action in the following words: "Animated by a spirit of liberality on behalf of the landlords and by virtue of the contrast offered between the rents collected by the landlord ($950) and those which would have resulted from the mathematical operation mentioned above (the basic rent of $116.67 for each of the five establishments)."

[11] The owner consistently refers to this amount as "the cost of construction of the building." However, at the examination of the expert he made reference to "the old structure." (Hearing of March 23, 1955, p. 15.) At the administrative hearing held on April 6, 1956, the magistrate, Mr. Freyre, set forth that: "the landlord, through his attorney Benjamín Rodríguez Ramón and the tenant, Mr. Ruiz, through his attorney Celedonio Medín Lozada, submit the amount of $19,000 as the *depreciated cost* of the original building." (P. 32.)

As a matter of fact the engineer, Mr. Canals, assessed the *entire*

troversy arose with regard to the value of the lot, because while the Administrator insisted in considering *only* the readjusted assessed valuation for tax purposes which amounted to $31,675.00, the owner sustained that the *market value* of the lot had to be considered also,[12] and he submitted expert testimony to establish said value between $75,000 and $92,000.[13] The rents for the different establishments were fixed at a total sum of $462.80, on the basis of the formula used by the Administrator who totally rejected the evidence regarding the market value of the lots.

The owner appealed to the Superior Court and attacked the orders. A judgment was rendered setting aside said orders and remanding the case to the Administration because the latter committed error in not considering the evidence presented regarding the market value of the lots.

---

structure at $44,812, and attributed to it a depreciation ranging from 20 to 25 per cent, to conclude that the value of the structure was from $35,000 to $36,000. From this sum he deducted what to his judgment represented the value of the work done by the tenants, which he assessed at $15,000, and he concluded that the value of the structure belonging to the landlord, *"of all the old things there"* was from $18,000 to $21,000 (Id., pp. 14 and 15). He ratified that what he considers as the *"new construction"* built by the tenants was not included in this valuation (Id., p. 17).

[12] We must make it clear that the act does not *expressly* authorize that the value of the lot be considered for the purpose of determining the rent in cases of constructions built subsequent to October 1, 1942, and that it merely authorizes that "the cost of construction" be used as basis thereof. *In order to avoid any contention of deprivation of property without due process of law*, the Administrator has adopted the practice of computing the rent on the basis of the value of the lot. Section 6(a)(7) of the Rent Regulations of 1959 (17 R. & R.P.R. § 186–6(a)(7)) provides that "The value of the lot, for the purposes of the fixing of the rent, shall be determined in the following manner: (A) The Administration shall take the cost of the lot appearing from the deed in favor of the person who constructed or for whom the structure was made, or the cost for the purposes of taxation, raised to 100%, whichever is greater. (B) . . . ."

[13] The expert presented by the owner committed an error of computation and testified that the minimum value was $65,000, after deducting 20% from the former valuation of $92,000. A simple mathematical operation shows that the result should be $73,600. Thereafter he made a reference to this sum of $73,000 (Id., p. 16).

554

Only a few months ago, we stated in *Coll* v. *Sec. of the Treas.*, *ante*, pp. 26, 35 (1960), that no stipulation or admission made by the parties may deprive the court of its power to interpret and apply the law, even when regarding the facts and the evidence, these stipulations and admissions are ordinarily binding on the court as well as on the parties. One of the reasons adduced in support of this doctrine is that "there are obvious *reasons of public policy* which prevent the courts from rendering judgments based upon erroneous rules of law, even though they arise from a stipulation agreed upon by the parties." Consequently, we rejected the interpretation made by the Secretary of the Treasury of § 291(*i*) of the Political Code including the surgical instruments of a dentist which are moved or worked exclusively by hand among those exempt from taxation. Thereafter, in *Cooperativa Cafeteros de Puerto Rico* v. *Government of the Capital*, *ante*, p. 49 (1961), we refused to accept an interpretation of the Municipal License Tax Act made by the defendant association excluding the plaintiff's business from the application of said Act, and we decided, on the contrary, that it was subject to the payment of the municipal license taxes under the classification of "mixed store".

Once again we are obliged to resort to the doctrine stated above and apply it to the case at bar. The facts clearly establish that the Administrator made use of an erroneous measure to determine and fix the rent for the commercial establishments involved in the proceeding pending before the administrative agency. The evidence undoubtedly indicates that this is not the case of a new construction built by the owner subsequent to October 1, 1942, which is the only situation where he is authorized by law to consider the cost of construction of the building and, by administrative interpretation, the value of the lot, in order to fix the rent therefrom. The object of the lease is a lot of 1650.20 square meters containing a building which had to be substantially improved

by the tenants before it was used. Since this property was rented on October 1, 1942, the Administrator can not disregard this basic rent, and he could readjust it only in the circumstances mentioned above. It is also possible for the Administrator to determine that it is actually a lease contract of urban lots, and in such a case, not subject to administrative control. *Riera* v. *Superior Court, supra.*

■ In *Peñagaricano* v. *Superior Court; Nadal, Int.,* 81 P.R.R. 849 (1960), we held that the Administrator of the Economic Stabilization lacks power to substitute retroactively the basic rent which was paid on October 1, 1942, by another reasonable one, but we stated that this Court cannot modify administrative orders—in that case, orders of reimbursement of rents paid in excess—if the prejudiced tenants did not request review thereof before the Superior Court. Since the tenants in the case at bar did not object to the orders of the Administrator, we shall limit ourselves to reversing the judgment rendered by the Superior Court setting aside the orders fixing the rent issued by the Administrator and which were challenged only by the owner.

Therefore, it is unnecessary to decide in this proceeding whether the Administrator may fix the value of the lot on the basis of the assessed valuation, with complete disregard of the evidence as to the market value thereof.[14]

MR. JUSTICE SANTANA BECERRA, concurring.

Upon concurring in the decision of this case I wish to state the following:

(1) It being unnecessary, because of the way this case has been treated by the majority, to do so, I abstain from expressing my view—even by way of explanation as stated by this Court in footnote 12 of its Opinion, and by impli-

---

[14] See, *People* v. *Amadeo, ante,* p. 98 (1961); *cf.* McK. Unconsol. Laws (N.Y.) §§ 8524, 8554 and 8584; *Application of No. 1 West 39th St. Corp.,* 178 N.Y.S.2d 141 (1958); *Application of 1359 Broadway Associates,* 134 N.Y.S.2d 235 (1954).

cation from the language of the last paragraph thereof—as to whether pursuant to § 6 of the Reasonable Rents Act which provides that the Administrator shall fix the reasonable rent for the dwellings or buildings constructed after October 1, 1942, "on the basis of the cost of construction of said dwelling or building," the factor of the lot should be included, whether in terms of cost or value; which abstention I deem of strict consequence, if it is intimated that a failure to do so involves a constitutional question of deprivation of property without due process of law. The legislative policy being what it is, this constitutes an important factor in the economic philosophy of the Rents Act, specially if the lot whereon the new building is situated belonged to the owner prior to October 1, 1942, as indicated in the case at bar and which this Court has not decided in the appropriate proceeding.

(2) I would not invoke the case of *Coll* v. *Sec. of the Treas.*, *ante*, p. 26, to decide the present case. Although this is not the appropriate place to express my opinion regarding said case, in the decision of which I did not participate, I think that its pronouncements should not keep growing or expanding. In any event, I do not think that the case at bar involves any legal interpretation that would give rise to a constitutional question of law, but rather an erroneous *finding of fact* made by the Administrator in deciding the case as one involving a new construction, when as a matter of fact it did not exist.

I am authorized by Mr. Justice Belaval and by Mr. Justice Hernández Matos to set forth herein that they concur in paragraph (2) above.